**Bobby J. GLASS, et al., Plaintiffs,**

and

**Federal Deposit Insurance Corporation, as Successor to the Rights of Security Savings Bank, FSB, Plaintiff–Intervenor,**

v.

**The UNITED STATES, Defendant.**

**No. 92–428C.**

United States Court of Federal Claims.

June 15, 1999.

---

Peter J. Broullire III, Albuquerque, New Mexico, for plaintiffs.

David L. Creskoff, with whom were Tina A. Lamoreaux and Stephen C. Zachary, Federal Deposit Insurance Corporation (FDIC), Washington, D.C., for plaintiff-intervenor FDIC.

Katherine M. Kelly, with whom were Jeanne E. Davidson, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, and David W. Ogden, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

### ORDER AND OPINION

SMITH, Chief Judge.

This case is before the court on the parties' cross-motions for summary judgment and defendant's motion to dismiss. The case involves the acquisition of Security Savings Bank, FSB (Security Savings) by Sentry Mortgage Corporation (Sentry) in 1986. Private plaintiffs are the four principal

shareholders of Sentry. The Federal Deposit Insurance Corporation (FDIC) has filed a complaint in intervention on behalf of Security Savings, which was placed into receivership in 1990, after the passage of the Financial Institutions Reform Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183. Both private plaintiffs and plaintiff intervenor allege that the passage of FIRREA breached the government's promise to permit Security Savings to count goodwill created as a result of the Sentry acquisition towards meeting its regulatory capital requirements. Private plaintiffs contend that there was either an express or an implied-in-fact contract with them, or that they were third party beneficiaries of the contract between the government and Sentry. The FDIC argues that there was either an express or implied-in-fact contract between Security Savings and the government. The government contends that its actions were purely regulatory, not contractual, and that, regardless, neither the private plaintiffs nor the FDIC has standing to bring a breach of contract claim.

This case has proceeded under the case management process instituted to manage the *Winstar*-related cases in the Court of Federal Claims in the wake of the United States Supreme Court's decision in *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). As such, the court has considered two additional waves of briefing related to this case in resolving the pending motions. First, the court ordered, at the end of its opinion in *California Federal Bank v. United States*, 39 Fed.Cl. 753 (1997) that the government show cause why summary judgment should not be entered in cases where there were pending motions for summary judgment. Second, the court ordered supplementary briefing on Common Issue 11, which dealt with the standing of various investor plaintiffs to sue for breach of contract. The court selected five cases, including this one, to frame and fully ventilate the standing issue, culminating in oral argument on the Common Issue on July 7, 1998. As with the show cause briefing, the court has considered fully the supplementary Common Issue briefing in resolving the pending motions.

As a result of the show cause process, the court identifies the following issues that are still in dispute. First, defendant contends that, even were the court to construe the documents it contends were regulatory in nature as creating a binding contract, the government's documents include no provisions regarding the treatment of goodwill, hence proving that the government did not agree to be contractually bound regarding the treatment of goodwill. Second, defendant contends, even if there were a contract, private plaintiffs have no standing to maintain this suit, whether as contract parties or as third party beneficiaries. Third, defendant contends that the FDIC cannot maintain a suit against the United States because those claims have been transferred to the FDIC in its corporate capacity. Because the FDIC in its corporate capacity is an instrumentality of the United States, defendant argues, it cannot bring suit against the United States.

For the reasons set forth more fully below, the court finds that Security Savings and the government, through the Federal Home Loan Bank Board, had a contract. This contract permitted goodwill created from the acquisition of Security Savings by Sentry to be used to fulfill regulatory capital requirements and to be amortized over twenty-five years. Second, the court finds that private plaintiffs, who owned Sentry and gained a controlling interest in Security through the merger, are third party beneficiaries of the contract. Third, the court finds the FDIC can maintain suit on behalf of the Security Savings receivership.

## BACKGROUND

The central facts are undisputed. Bobby Glass, Gary Stillwell, Stephen Strickland, and Walter L. Rose were the principal stockholders of Sentry. On December 16, 1985 Sentry and Security entered into an "Agreement Between Sentry Mortgage Corporation and Security Savings Bank." Pursuant to the agreement, the non-cash assets of Sentry would be exchanged for shares of common and preferred stock sufficient to convey a controlling interest in Security to Sentry. At

the time of the agreement, Security was unable to meet its net worth requirements under the FHLBB's Insurance Regulations. The agreement was designed to recapitalize Security, through the contribution of the non-cash assets of Sentry, in exchange for conveying the controlling interest of Security to Sentry.

In connection with the proposed sale, Security submitted a "Business Plan/Notice of Change in Control" to the FHLB–Dallas on February 26, 1986. The Business Plan, among other things, provided that the acquisition would be done using the purchase method of accounting and indicated that the acquisition was premised on the assumption that eight regulatory forbearances would be granted, including amortization, on a 25–year straight-line basis, of goodwill created as a result of the transaction. By letter dated June 18, 1986, the Federal Home Loan Bank–Dallas conditionally approved the transaction, provided that several conditions were met. In addition, the FHLB–Dallas letter dealt specifically with seven of the eight forbearances requested by Security in its proposed Business Plan; the only one not mentioned in the letter was the request to amortize the resultant goodwill on a straight-line basis over 25 years.

The letter contained several other conditions. It required that the board of directors of the Association execute and submit an operating agreement "in conjunction with the submitted business plan" within 30 days of the transaction. It also conditioned approval of the merger on FHLBB approval of the non-cash contribution of Sentry's assets at an appraised value of $3.9 million for regulatory accounting purposes. (In their Business Plan, Sentry and Security had requested that the assets be valued at $4.8 million.)

On June 30, 1986, the Board of Directors executed an Operating Agreement, in which Security stated: "There will be no material or significant changes in or deviations from the Business Plan unless and until such changes or deviations have been approved by

the principal supervisory agent." On the same day, the FHLBB issued Resolution 86–672, which approved the inclusion of the non-cash assets of Sentry to be recorded on the books of Security at a fair market value of $3.9 million.

As a result of the transaction, Security now had $6,258,487 in goodwill [1], which it proceeded to amortize on a 25–year, straight-line basis. After the passage of FIRREA and the subsequent implementing regulations, Security was prohibited from using goodwill to meet tangible capital requirements and their right to use goodwill in computing core capital was seriously restricted. The thrift was subsequently placed into receivership in May 1990.

## DISCUSSION

### 1. Contract Formation

■ Defendant does not dispute that the result of this process was that government regulators permitted Security to amortize goodwill over 25 years on a straight-line basis, and to use that goodwill in meeting capital requirements. Defendant contends, though, that this was only a matter of regulatory grace: there was no contract formed. Further, the only document of the government that deals with the forbearance requests made by Security in the Business Plan ignores completely the requested treatment of goodwill. Hence, defendant contends that the evidence shows that defendant never agreed to anything, whether contractual or not, regarding the treatment of goodwill.

Based on the documentary evidence and uncontested course of conduct between the parties, the court finds that Sentry and Security entered an implied-in-fact contract with government regulators to permit Security to amortize goodwill over 25 years on a straight-line basis, and to use that goodwill in meeting regulatory capital restrictions. The record amply supports that there was mutuality of intent, offer and acceptance, and con-

---

1. This consisted of an amount of supervisory goodwill created as a result of the purchase method of accounting from the acquisition of Security, $4,136,519, and an amount of goodwill arising from the $3.9 million value assigned to the assets of Sentry, $2,221,968, for a total goodwill amount of $6,258,487.

sideration. In short, Security and Sentry agreed to engineer the sale and recapitalization of Security, using the assets of Sentry, in exchange for agreed upon regulatory treatment.

The Business Plan/Notice of Change of Control, submitted to the FHLB–Dallas as part of the regulatory approval process, indicated that the acquisition would use the purchase method of accounting and specifically requested eight forbearances, including that the thrift be permitted to amortize the resulting goodwill on a straight-line basis over 25 years. The June 18, 1986 letter of the Principal Supervisory Agent denied, granted, or modified seven of the eight requested forbearances. It also attached additional conditions to FSLIC approval, including a requirement that the Board of Directors submit an operating agreement "in conjunction with the submitted business plan." In addition, the letter stated:

> This letter does not and shall not be construed to constitute forbearance or waiver by the FHLBB or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs 6.a. through 6.g. [which deal with the other seven forbearances requested in the business plan]

Defendant argues that, contract or no contract, there is no documentary evidence that the government ever agreed to a forbearance regarding the treatment of goodwill, and that the letter suggests that such a forbearance was not granted. While it is true that the letter does not mention the treatment of goodwill, that fact does not resolve the question. The language of the letter cannot be read to either grant the specialized goodwill treatment Security requested or to deny it. The letter specifically denies or grants the other requested forbearances. It thus cannot be read as dealing with the requested goodwill forbearance.

However, the same letter required that the Board of Directors execute and submit an operating agreement in conjunction with the submitted business plan, which had provided for the purchase method of accounting and the write-off of the goodwill on a 25–year straight-line basis. Plaintiffs subsequently executed an operating agreement pursuant to the June 18th letter, which indicated to regulators that "[t]here will be no material or significant changes in or deviations from the Business Plan." The Business Plan, in turn, was premised on the purchase method of accounting and the 25–year amortization period being utilized. The FHLBB Board Resolution, while not mentioning goodwill, affirmed the fair market valuation of the cash infusion of Sentry's assets at $3.9 million. Security then proceeded, until passage of FIRREA, to account for the goodwill (with the modification created by the modified valuation of Sentry's assets) as originally contemplated in its Business Plan without objection from regulators.

Thus, while neither the letter from the PSA nor the FHLBB memorandum mentions goodwill, the record shows that Security and Sentry made an offer, to effect the acquisition and recapitalization of Security, in exchange for certain regulatory treatment, which was expressed in the June 18th letter, the FHLBB Resolution, and the course of conduct by regulators towards Security's treatment of the resultant goodwill as envisaged in the Business Plan. Sentry and Security offered to take care of a problem institution through their transaction; the regulators agreed, with modifications contained in the June 18, 1986 letter from the PSA, and the transaction proceeded in conformance with those modifications. At all times, both Security and the regulators operated with the understanding that the resulting goodwill would be used towards meeting regulatory capital requirements, and amortized over 25 years.

Defendant offers the affidavit of James Orzbut, who was a supervisory analyst at the Federal Home Loan Bank–Dallas, and who was involved in reviewing the Sentry/Security transaction, to defeat the notion that regulators intended to enter into a contract. The affidavit states:

> To the best of my recollection, I did not tell anyone from Sentry or Security that the decision not to disapprove the acquisition of Security constituted a contract. I have no recollection that any of my colleagues at the Dallas–FHLB made any

such representation either. This is consistent with my understanding that the decision did not constitute a contract. Finally, I have no recollection of anyone from Sentry or Security telling me that they believed they had a contract with the government concerning this transaction.

In light of other documentary evidence in the record, this recitation of a legal conclusion by Mr. Orzbut—that there was no contract—is belied by the documents, the circumstances surrounding the transaction, and the course of conduct of the parties. Documentary evidence provided by plaintiff-intervenor FDIC indicates that the FHLBB understood that this was a "supervisory case," and that approval of the non-cash contribution of Sentry's assets as part of the acquisition benefitted the government by providing a resolution to the problem without resorting to government cash or other financial assistance. *See, e.g.,* Federal Home Loan Bank Board Executive Summary (undated) from Francis Passarelli, Acting Director, Office of Examination and Supervision (OES), to Jeff Sconyers, FHLBB Secretary, regarding Security's Request to Record the Contribution of Sentry Mortgage Corporation at its Fair Market Value for Regulatory Accounting Purposes; June 25, 1986 FHLBB Issues Memorandum from Joseph Arendes, OES Assistant Director for Regional Operations, to Jeff Sconyers, regarding the Non Cash Contributions of Sentry to be recorded at Fair Market Value for RAP Reporting Purposes ("*Proposal* ...[t]he Supervisory Agent has processed the notice and has decided to approve the change of control notice under delegated authority. Security is a supervisory case and is insolvent by $87,000 as of April 30, 1986. The monthly operating loss is $80,000. It is believed that this is a very good solution to this supervisory case... *Advantages* Approval of the transaction would allow for the unassisted resolution of a supervisory case... Approval of the transaction could prevent the eventual occurance [sic] of a loss to the FSLIC.").

These documents highlight that defendant did not consider this to be a mere routine regulatory action, but an action designed to resolve a problem involving an insolvent institution, and to do so at no cost to the FSLIC. Moreover, the realities of the transaction are such that the transaction would have made no sense had Security not been able to effect the guaranteed treatment of the goodwill. As plaintiff FDIC points out, Security would have had a RAP net worth of nearly -$2.5 million had it not been permitted the treatment of supervisory goodwill for which it contracted. To do so without a contractual guarantee would simply be irrational, and the only logical inference is that Security planned to utilize the goodwill on its books, that the regulators understood this to be the case, and that they agreed to this in order to resolve a supervisory case without any cash or other infusion needed by the government. If the treatment of supervisory goodwill were merely a matter of regulatory grace, then conceivably the government would be able to disallow the goodwill immediately after the transaction closed and seize the thrift after Sentry had contributed its whole company to the recapitalization effort. This, to borrow a word from the Supreme Court, would have been "madness" had Sentry and Security not received contractual guarantees, which were manifested by the regulators' acceptance of the Operating Agreement and Security's subsequent use of the goodwill for regulatory capital purposes.

Accordingly, the court finds that there was an implied-in-fact contract between Security, Sentry the FHLBB and the FSLIC, whereby Sentry agreed to use its assets to recapitalize Security in exchange for the controlling interest of Security, and the regulators agreed to certain regulatory treatment, including the ability to use the goodwill created by the transaction, for regulatory accounting purposes, amortized on a straight-line basis over a 25-year period.[2]

2. In its reply in support of its cross-motion for summary judgment against the four private plaintiffs, defendant contends that Security failed existing capital requirements prior to the passage of FIRREA, and that the plaintiffs did not infuse sufficient capital into Security prior to the breach of contract, which they had agreed to do individually as a condition for the approval of Sentry's acquisition of Security. The court does not resolve the issue of whether this was a prior material breach, or if any alleged damages were

## 2. Standing of plaintiffs

The court has found that Sentry and Security entered into an implied-in-fact contract with the FHLBB for certain regulatory treatment—specifically the allowance of supervisory goodwill to meet regulatory capital requirements—in exchange for Sentry's acquisition and recapitalization of Security. Private plaintiffs, who are the four principal shareholders of Sentry, and who became the principal shareholders of Security, argue variously that they are parties to an express or implied-in-fact contract, or are third party beneficiaries. The documentary evidence shows, however, that individually the four private plaintiffs did not contract for the treatment of goodwill resulting from the acquisition; Sentry did. Sentry, of course, was subsumed as a result of the acquisition and the shareholders became controlling shareholders of Security. They are not parties to the contract; the question is whether they are third party beneficiaries of the contract between Sentry, Security and the government.

The court believes that the situation involving the four Sentry shareholders is similar to that of the investor third party beneficiaries in *Castle v. United States*, 42 Fed.Cl. 859 (1999), and accordingly the same analysis obtains in this instance. The entire purpose of this contract was to provide certain regulatory treatment in order to induce the four shareholders of Sentry to recapitalize Security by infusing Sentry's non-cash assets into Security. Security had nothing to offer the government prior to the transaction—indeed it was insolvent and the transaction was prompted by regulatory concerns over this problem. Moreover, the regulators knew that it was the capital infusion that was being provided directly by the four shareholders of Sentry acting in concert. The government's

own documents buttress this point. The FHLBB Board Resolution approving the valuation of the assets of Sentry recognized this: "the [FHLBB] has considered the request of the *four principal stockholders* of Sentry Mortgage Corporation ... (emphasis added)." Moreover, the June 18th letter from the PSA required, as a condition of their approval of the acquisition, that the four principal stockholders enter into a written agreement to individually maintain the net worth of the institution. The government recognized that the entire purpose of providing these promises to Sentry and Security was to induce the shareholders of Sentry to provide the entirety of their Sentry holdings in order to recapitalize Security. Just as in *Castle*, it was for the investors' benefit, to induce their investments, that the government made its promise.[3]

In order to qualify as a third party beneficiary, "the contract must 'reflect the express or implied intention of the parties to benefit the third party.'" *Montana v. United States*, 124 F.3d 1269, 1273 (Fed.Cir.1997). Further, "[t]he intended beneficiary need not be specifically or individually identified in the contract, but must fall within the class clearly intended to be benefitted thereby." *Id.* The nature and circumstances of this transaction show that the goodwill promise, while made to Security, was made to ultimately benefit the Sentry shareholders in order to get them to contribute their assets to Sentry. The contract is, and its creation of third party beneficiary status for the four individuals is, quite consistent with the analysis laid out in *Montana*. Clearly implicit in the contract is the intention to benefit those Sentry shareholders. In fact, it is the core purpose of the regulatory promises made.

---

caused by defendant's breach. These are issues to be resolved by the Trial Judge if necessary.

**3.** The court recognizes that, on some abstract basis, every contract with a firm is for the benefit of its shareholders, and that mere shareholder status does not automatically confer third party beneficiary status on a shareholder. As plaintiff FDIC stated in its Common Issue 11 brief, "[s]hareholder Plaintiffs must show something more." In this instance, they have. Shareholder plaintiffs have shown, as in *Castle*, that the

contractual goodwill promise was effected, in large measure, to induce these four specific people to contribute the entirety of their Sentry assets to recapitalize Security. Just because a shareholder is not automatically a third party beneficiary, it does not follow that being a shareholder automatically deprives one of third party beneficiary status. Rather, the contract must be reviewed to determine whether it confers such a status on a person or class of persons.

### 3. *Standing of the FDIC as party plaintiff*

■ Defendant argues that, even were the court to find that there was a contract between Security and the government, plaintiff-intervenor FDIC has brought this claim, as it has in most other *Winstar*-related cases in which it has intervened, in its capacity as manager of the FSLIC Resolution Fund (FRF). Defendant contends that the RTC, operating as receiver, sold its claim for consideration to the RTC in its corporate capacity (RTC–Corporate), and that those assets are now held by the FRF–RTC, which succeeded to all assets and liabilities of the RTC upon the dissolution of the RTC, by operation of law, on December 31, 1995. Both RTC–Corporate and the FRF–RTC are instrumentalities of the federal government. Accordingly, defendant argues, the FDIC's suit is really a suit by the United States against the United States, and represents a non-justiciable intra-governmental dispute.

The FDIC describes the situation quite differently. The FDIC, at least when acting as the receiver, and not when acting as a client agency of the Department of Justice defending the government in these lawsuits, contends it is bringing the failed thrift's claim, which, through several transfers, ultimately alighted in the FRF–RTC, which FDIC manages. The FDIC is emphatic that it is bringing only a claim that the now-defunct thrift possessed. This claim devolved to the receiver of Security, and the claim has survived the subsequent transfers to RTC–Corporate and to the FRF upon the RTC's dissolution. Additionally, plaintiff FDIC contests defendant's notion that RTC–Receiver sold the claims to RTC–Corporate.

The court will address the question of the sale first. Defendant contends in its brief regarding the FDIC's standing that "the claims were sold for book value, which exceeded market value." Since, as FDIC points out, these claims were carried at a book value of zero, this statement simply is wrong. There is no evidence that the claim was "sold" by the receiver for value, in exchange for some sort of release from liability for any breach. The proper understanding is that the claim of the receiver was transferred to the RTC–Corporate. The question is whether that action, and the subsequent transfer of the claim to the FRF, creates a non-justiciable intra-government dispute which this court cannot hear.

FDIC has presented a clear recitation of the statutory language which indicates that the FDIC can bring the claim on behalf of Security, even though that claim is owned by the FRF. RTC–Receiver transferred the goodwill claim to RTC–Corporate on November 16, 1990, pursuant to 12 U.S.C. § 1823(d)(1). Section 1823(d)(3)(A) provides that:

> [w]ith respect to any asset or liability assumed pursuant to this section, the Corporation shall have all of the rights, powers, privileges, and authorities of the Corporation as receiver under sections 1821 and 1825(b) of this title.

Although, as defendant points out, this section deals with the FDIC and not the RTC, 12 U.S.C. § 1441a(b)(4)(A), vests the RTC with the same powers that the FDIC has under, among other sections, section 1823. The statute clearly indicates that, notwithstanding the transfer, RTC–Corporate maintained the same rights, powers, privileges and authorities—which would include right to pursue the claim on behalf of the Security receivership—that RTC–Receiver possessed.

The question then is did the claim survive the dissolution of the RTC. Pursuant to 12 U.S.C. § 1441a(m)(2), upon the sunset of the RTC, "all assets and liabilities of the Corporation [RTC] shall be transferred to the FSLIC Resolution Fund." It seems clear to the court that "all assets" would have to include the right to maintain the lawsuit on behalf of Security for breach of contract damages suffered by the thrift. The government's interpretation—that the statute did not also transfer the status of receiver to the FRF—would mean, as the FDIC points out, "that Congress chose deliberately give FRF–RTC *in all cases fewer rights* to collect on its assets than RTC had during its existence (emphasis in original)." Even were the statutory succession not clear, such an interpretation of the statute would be illogical.

The FDIC is therefore permitted, in its capacity as manager of the FRF–RTC, to bring this breach of contract damage claim on behalf the failed thrift. FDIC has adequately shown that it owns the claim of the failed thrift and that no law bars the court from hearing the claim. The fact that the FDIC's role has evolved so oddly over the last ten years—Judge Miller in *Statesman* aptly called the FDIC's government roles as "hydraheaded"—does not mean that the receivership interest of Security has disappeared. What's more, plaintiff-FDIC, as the manager of the FRF, is the only party that can bring the claim on behalf of the Security receivership.

## CONCLUSION

For the reasons set forth above, and for the reasons set forth in the prior *Winstar*-related opinions of this court, particularly *California Federal Bank v. United States*, 39 Fed.Cl. 753 (1997) defendant's motions for summary judgment and motion to dismiss are denied. The motions of private plaintiffs and plaintiff-intervenor FDIC for summary judgment as to the existence of a contract providing for the treatment of supervisory goodwill, and that FIRREA was a breach of that contract, are granted. A finding of liability is reserved pending resolution of defendant's contract defense of prior material breach, which will be considered by the Trial Judge.

It is further ORDERED that, pursuant to RCFC 77(f), the Omnibus Case Management Order (September 18, 1996) and the Priority Cases Pretrial Scheduling Order (April 2, 1997), this case will be assigned on June 25, 1999 to Senior Judge Lawrence S. Margolis as Trial Judge for all further proceedings, except for motions for clarification of this opinion. The Chief Judge will retain jurisdiction of the case until that date.