Damian SINCLAIR, Plaintiff,

v.

THE UNITED STATES, Defendant,

No. 00–598C.

United States Court of Federal Claims.

April 16, 2001.

Warren L. Dennis, Washington, DC, for plaintiff. Amybeth Garcia–Bokor and Karen Coombs, Proskauer Rose LLP, and Helen Davis Chaitman and Alex Schmidt, Wolf Haldenstein Adler Freedman & Herz LLP, New York City, of counsel.

David F. D'Alessandris, Washington, DC, with whom was Acting Assistant Attorney General Stuart E. Schiffer, for defendant. Douglas B. Jordan, Office of the Comptroller of the Treasury, of counsel.

## ORDER

MILLER, Judge.

This case comes before the court after argument on defendant's motion to dismiss for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. Plaintiff alleges that defendant improperly interfered with plaintiff's pursuit of his business plan after plaintiff infused

capital into a failing bank and the federal banking system. Plaintiff's complaint pleads a contract action (Counts I through V) and a deprivation of plaintiff's property rights in violation of the taking and due process clauses of the Fifth Amendment (Count VI).

## FACTS

All facts are drawn from the complaint in a light most favorable to plaintiff. Prior to March 2000, Northwest National Bank was reputed to be the worst performing bank in the state of Arkansas. Damian Sinclair ("plaintiff"), an individual with many years of experience in the financial services industry, sought to acquire Northwest National Bank beginning in December 1999. To this end, on December 14, 1999, plaintiff met with the Office of the Comptroller of the Currency (the "OCC"). The OCC is an office within the United States Treasury that approves applications for change of control for acquisition of national banks. At the December 14, 1999 meeting, OCC officials represented that "they had no problem, in concept, with the plans proposed by [plaintiff]." Compl. filed Oct. 4, 2000, ¶ 16.

Plaintiff's plan for the Northwest National Bank was based on "non-prime lending" with emphasis on minority- and low-income borrowers. Plaintiff submitted to the OCC a detailed business plan demonstrating how plaintiff planned to restore Northwest National Bank to profitability employing lending and lending techniques that plaintiff had utilized in the past. One technique was the use of bulk-loan purchases. Plaintiff outlined a long-term strategy to purchase bulk-loans from Stevens Financial Group, Inc. ("SFGI"), an entity formerly owned by plaintiff.

After the December 14, 1999 meeting, plaintiff submitted to the OCC detailed information regarding his background, management plans, management team, and proposed business plans for Northwest National Bank. Plaintiff was required to present this information by 12 U.S.C. § 1817(j)(6) (1994 & Supp. V 1999), which requires a potential acquirer to submit "[a]ny plans or proposals which any acquiring party making the acquisition may have ... to make any other major change in its business or corporate structure

or management." 12 U.S.C. § 1817(j)(6)(E). These materials included formal submissions, correspondence, in-person presentations, and telephone communications.

The OCC reviewed the information pursuant to 12 U.S.C. § 1817(j)(2)(B). The OCC is authorized to disprove a proposed acquisition if it determines that any of a number of specified factors are inconsistent with approval. *See* 12 U.S.C. § 1817(j)(7)(A)—(F).

On February 28, 2000, plaintiff had a contentious telephone conversation with Deputy Comptroller John A. Bodnar of the OCC. Mr. Bodnar stated he was unaware of the "type" of lending plaintiff intended to carry out. Plaintiff alleges that Mr. Bodnar "expressed a strong dislike, during this conversation, for any of 'his' national banks lending to 'those kind of people.'" Compl. ¶ 27. On February 29, 2000, Mr. Bodnar telephoned plaintiff and "advised that the OCC would approve the application for Change of Control and the business plan, but only if Sinclair agreed to maintain enhanced risk-based capital for automobile loans and manufactured housing at 15% and for other loan categories at other percentages." *Id.* ¶ 30.

Apparently, on the same date (February 29, 2000), the OCC drafted and signed a letter approving plaintiff's acquisition, but did not release the letter. On March 1, 2000, plaintiff described certain capital ratios to be maintained at the bank in a "commitment letter." Plaintiff signed the commitment letter stating, "I accept and commit to maintain the leverage and capital ratios noted above upon the acquisition of Northwest National Bank in Gravette, Arkansas as discussed by telephone with John A. Bodnar on February 29, 2000." The commitment letter also stated:

> Based on our earlier conversation today, it is my understanding that upon receipt of this letter today, you will be both faxing and mailing the OCC approval dated February 29, 2000 of the above referenced acquisition to [plaintiff's representatives].

The February 29, 2000 OCC letter indeed did approve plaintiff's acquisition and stated:

> The Comptroller of the Currency ("OCC") has reviewed and evaluated your notice of

change in bank control involving the Northwest National Bank, Gravette, Arkansas. Based upon a thorough review of all information available, including representations and commitments made in the notice, this letter is issued to convey our intent not to disapprove the proposed change of control. Your proposed acquisition may proceed immediately.

Apparently, the OCC released the February 29, 2000 letter on March 1, 2000, after receipt of plaintiff's March 1, 2000 commitment letter. The acquisition thereafter was completed, and on March 7, 2000, Northwest National Bank changed its name to Sinclair National Bank ("SNB").

On April 24, 2000, OCC representatives met with and spoke to SNB employees about plaintiff's operation. At the conclusion of this on-site visit, one of the OCC representatives, Kevin Russell, stated that he wanted to consider more closely with the OCC's legal staff whether there was a potential "loan-to-one borrower" violation based on the nature of SNB's agreement with SFGI, the entity formerly owned by plaintiff and now selling loans to SNB. On May 3, 2000, the OCC advised plaintiff by telephone that there appeared to be a serious "loan-to-one borrower" violation by SNB as a result of an additional credit enhancement provided by SFGI. At the OCC's request, plaintiff suspended bulk acquisition of loans from SFGI until the matter was resolved.

A May 17, 2000 letter from OCC Assistant Deputy Comptroller F. Christian Dunn advised plaintiff of alleged violations of 12 U.S.C. § 84, the "loan-to-one borrower" rule. The letter stated that the OCC had determined that "four pools" purchased from SFGI constituted violations of the legal lending limit. Soon thereafter, on June 28, 2000, the OCC served a "Notice of Deficiency" on SNB pursuant to 12 C.F.R. § 30.3(b), which allows the OCC to request a bank to submit "a safety and soundness compliance plan" upon a determination that a bank is failing to meet operational and managerial standards.

Although SNB made a series of submissions to the OCC over the following months, it was unable to address fully the OCC's concerns. The submissions by SNB from May 2000 to October 2000 included responses to specific OCC inquiries, opinions from independent counsel on behalf of SNB, in-person meetings with OCC officials, and original and revised compliance plans. In response to these submissions, the OCC advised plaintiff of its continuing concerns with SNB and appraised plaintiff of new concerns. The OCC is currently considering the revised compliance plan, and plaintiff predicts that "[a] major safety and soundness exam is scheduled which will, with certainty, lead to a plethora of new contrivances." Compl. ¶ 102.

This action was filed on October 4, 2000, in the United States Court of Federal Claims, with a parallel complaint filed that same date in the United States District Court for the District of Columbia. Count I of the complaint alleges that "the conduct of the OCC in contravention of the agreement of March 1, 2000, constitutes an abrogation and breach of plaintiff's contract rights by the United States," Compl. ¶ 110, and seeks damages for such breach. Count II seeks restitution for the alleged breach, Count III seeks restitution for repudiation and anticipatory breach of the alleged contract, and Count IV seeks restitution for promissory estoppel. Count V alleges frustration of purpose. Finally, Count VI seeks just compensation for violation of the Fifth Amendment.

## DISCUSSION

### 1. Jurisdiction

■ Jurisdiction over a contract action in the Court of Federal Claims is based upon the Tucker Act. An action can be maintained if it is "founded ... upon any express or implied contract with the United States...." 28 U.S.C. § 1491(a)(1). This language is the predicate for defendant's argument that jurisdiction is present only if plaintiff "establish[es] the existence of a contract with the OCC...." Def.'s Br. filed Jan. 3, 2001, at 12. This view is incorrect. As the Federal Circuit stated in *Trauma Service Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir. 1997):

A well-pleaded allegation in the complaint is sufficient to overcome challenges to jurisdiction. *Spruill v. Merit Sys. Protection*

*Bd.*, 978 F.2d 679, 686 (Fed.Cir.1992). [Plaintiff's] complaint alleges that an express and, in the alternative, an implied-in-fact contract underlies its claim. This allegation suffices to confer subject matter jurisdiction in the Court of Federal Claims. *See Gould v. United States,* 67 F.3d 925, 929 (Fed.Cir.1995); *see also Do–Well Mach. Shop, Inc. v. United States,* 870 F.2d 637, 639–40 (Fed.Cir.1989) ("Jurisdiction, therefore, is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.") (quoting *Bell v. Hood,* 327 U.S. 678, 682, [66 S.Ct. 773, 90 L.Ed. 939] (1946)).

Plaintiff's complaint contains a well-pleaded allegation of an express contract underlying his claim. It is clear then that plaintiff has established jurisdiction.

Defendant would be well-advised to consider that it failed to cite to controlling authority that had rejected its argument. Such conduct, as well as misrepresenting the law to the court, is sanctionable. *Abbs v. Principi,* 237 F.3d 1342, 1345 (Fed.Cir.2001).

### 2. *Failure to state a claim*

"A motion to dismiss under rule 12(b)(4) for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not under the law entitle him to a remedy." *Perez v. United States,* 156 F.3d 1366, 1370 (Fed.Cir.1998). In "evaluating a RCFC 12(b)(4) motion, this court construes unchallenged allegations in favor of the pleader." *Trauma Serv. Group,* 104 F.3d at 1325.

#### 1) *Contract*

Plaintiff's principal argument is that the OCC entered into a contract with plaintiff which was then breached when the OCC began to question the manner in which plaintiff was operating SNB. The substance or terms of the alleged contract is the first order of business for the court.

The complaint states that Mr. Bodnar made an verbal offer to plaintiff. The offer was communicated in a telephone conversation on February 29, 2000. Mr. Bodnar "advised that the OCC would approve the application for Change of Control and the business plan, but only if [plaintiff] agreed to maintain enhanced risk-based capital for automobile loans and manufactured housing at 15% and for other loan categories at other percentages." Compl. ¶ 30. Plaintiff makes the same allegation in his brief, asserting that Mr. Bodnar "stated that the OCC would approve the Change in Control application and business plan in return for [plaintiff]'s agreement to maintain certain capital level ratios substantially in excess of that which was otherwise required.... On March 1, 2000, [plaintiff] accepted this offer." Pl.'s Br. filed Jan. 30, 2001, at 6. Thus, the terms of the contract, as asserted by plaintiff, are clear: Plaintiff agreed to maintain certain capital level ratios in exchange for OCC approval of plaintiff's application and business plan.

Defendant rejoins that no offer was put forward; no acceptance was manifest; and, in any event, no official had authority on behalf of the OCC to make such a contract. Accordingly, defendant characterizes the actions of Mr. Bodnar and the OCC as made in furtherance of the OCC's statutory duties to regulate national banks. As such, defendant rejects these actions as the basis for a contractual claim. This must be so, defendant declares, because the OCC lacked authority to enter into the contract alleged by plaintiff. Plaintiff responds that *United States v. Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *Glass v. United States,* 44 Fed.Cl. 73 (1999); and *Anderson v. United States,* 47 Fed.Cl. 438 (2000), compel a result in plaintiff's favor.

In *Winstar* the Supreme Court noted that both the Court of Federal Claims and the Federal Circuit determined that plaintiff had express contracts spelling out the bargain undertaken by the Government and plaintiffs. *Winstar,* 518 U.S. at 860–62, 116 S.Ct. 2432. The integration clause of the contracts at issue made reference to documents that contained "a stipulation that any goodwill arising from this transaction shall be determined and amortized in accordance with [Bank Board] Memorandum R–31b." *Id.* at 862, 116 S.Ct. 2432.

The Supreme Court further recognized that, in the banking industry, regulators have a "proven propensity to make changes in the relevant [capital] requirements." *Winstar*, 518 U.S. at 863, 116 S.Ct. 2432. Bank regulators, like those in the present case, have sovereign power to regulate their wards and this power cannot be abrogated. However, as the Supreme Court recognized, " '[t]he Government cannot make a binding contract that it will not exercise a sovereign power, but it can agree in a contract that if it does so, it will pay the other contracting party the amount by which its costs are increased by the Government's sovereign act.' " *Id.* at 881–82, 116 S.Ct. 2432 (quoting *Amino Bros. Co. v. United States*, 178 Ct.Cl. 515, 525, 372 F.2d 485, 491(1967)). Thus, *Winstar* elucidated the principle that regulated banks can make express contracts with the Government that allow payment to the banks in the event that Government exercise its regulatory power causes increased costs. " '[T]he liability of the Government in such circumstances rests upon the contract and not upon the act of the Government in its sovereign capacity.' " *Id.* at 882 n. 25, 116 S.Ct. 2432 (quoting *Sunswick Corp. v. United States*, 109 Ct.Cl. 772, 798, 75 F.Supp. 221, 228 (1948)). The *Winstar* plaintiffs bargained for certain regulatory treatment and recovered for breach when that regulatory treatment was not forthcoming.

*Glass* extended this principle to implied-in-fact contracts between the Government and banks. The court concluded that "[the to-be-acquired bank and plaintiffs] entered an implied-in-fact contract with government regulators to permit [the to-be-acquired bank] to amortize goodwill over 25 years on a straight-line basis, and to use that goodwill in meeting regulatory capital restrictions." *Glass*, 44 Fed.Cl. at 76. More succinctly, the court ruled that "[plaintiffs and the to-be-acquired bank] agreed to engineer the sale and recapitalization of [the to-be-acquired bank], using the assets of [plaintiffs], in exchange for agreed upon regulatory treatment." *Id.* at 77. The existence of an implied-in-fact contract rested on documentary evidence suggesting that, in addition to seven other forbearances explicitly granted to plaintiffs, the Government and plaintiffs intended to agree to a forbearance regarding the treatment of goodwill. A Federal Home Loan Bank Board Resolution affirming the fair market value of the bank's assets, which was premised on the agreed-upon treatment of goodwill, also supported this finding.[1]

Taken together, these cases demonstrate that the Government can form an express or implied-in-fact contract to grant individuals or entities certain regulatory treatment and abide by such a promise or pay damages when that treatment is not forthcoming.[2] The breach of this agreement in these cases was the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act, Pub.L. No. 101–73, 103 Stat. 183, in 1989.

Plaintiff's key allegation is that "the OCC agreed to permit [plaintiff] to implement a specific business plan." Pl.'s Br. filed Jan. 30, 2001, at 2. This agreement, according to plaintiff, was embodied in an implied-in-fact contract. In addition to the alleged promise to approve the acquisition, plaintiff alleges that the OCC made a further promise to allow plaintiff to implement a business plan without interference from the OCC.[3] Arguing that this further promise was implic-

---

1. Defendant argues that in *Cienega Gardens v. United States*, 194 F.3d 1231, 1245 (Fed.Cir. 1998), the Federal Circuit "found the absence of an identifiable contract with the Government to be dispositive evidence that regulatory action had not been 'contractualized.' " Def.'s Br. filed Jan. 3, 2001, at 25. *Cienega Gardens* was decided on a summary judgment motion after discovery revealed no contract between plaintiffs and the Government, while defendant's assertion presupposes the lack of an identifiable contract in this case. *Cienega Gardens*, therefore, is not instructive with respect to the issue presented here: whether plaintiff has pleaded the existence of an agreement for regulatory forbearance.

2. *Anderson v. United States*, 47 Fed.Cl. 438 (2000), also advanced by plaintiff, is not on point. Defendant assumed the existence of a contract in *Anderson* and defended on the ground that the contract had been forfeited by fraud. Thus, *Anderson* and the cases cited therein, while illuminating on the question of what the terms of an alleged contract might be, provide no guidance as to whether a contract was formed at all.

3. Plaintiff pleads in his complaint:

  2. On or about March 1, 2000, Plaintiff Damian Sinclair ("Sinclair"), entered an agreement with the OCC pursuant to which the

it in the OCC's generic approval of the acquisition, plaintiff seeks to bring his case within the ambit of *Winstar*.

*Winstar* was a decision relating to breach of an express contract that contained specific terms relating to the regulatory treatment of goodwill for which the plaintiffs had bargained. Although *Glass* appears to represent the outer boundary of this contract rationale, it still was premised on an implied-in-fact contract that was limited to an agreement regarding regulatory treatment of goodwill. The instant case, as framed by plaintiff, goes further[4] in that the alleged contract was formed though approval of an acquisition plan and contained the ill-defined promise to allow plaintiff to "implement" that plan. The breaching activity complained of is the action of agency officials who were charged with overseeing SNB to protect the public interest in the safe and sound operation of national banks. Extending *Winstar*'s approach to this case, as envisioned by plaintiff, could transform any disagreement with agency exercise of its regulatory authority into a contract action.

> OCC approved Sinclair's acquisition of Northwest National Bank ("NNB") of Gravette, Arkansas, a financially troubled institution. The approval was contingent on Sinclair's written commitment to maintain certain enhanced capital ratio levels at the bank, in return for which the OCC agreed to permit Sinclair to implement a specific business plan and engage in a carefully articulated program of specialized targeted consumer lending.
>
> . . . .
>
> 5. The OCC expressly approved Sinclair's business plan, credit underwriting and bulk loan purchase plans and his plans for serving this population, not traditionally well-served by national banks, particularly in this area of the United States.
>
> . . . .
>
> 30. On February 29, 2000 after 5:00 p.m., [Mr.] Bodnar called Sinclair and advised that the OCC would approve the application for Change of Control and the business plan, but only if Sinclair agreed to maintain enhanced risk-based capital for automobile loans and manufactured housing at 15% and for other loan categories at other percentages.
>
> . . . .
>
> 47. The business plan section of the application submitted by Sinclair set forth a highly detailed proposed strategy based upon lending and lending techniques of the type described above. The business plan was the foundation of Sinclair's proposal to restore NNB to profitability and turn it around from a failing institution to a thriving institution. It was the *sine qua non* of the proposal to acquire NNB. In approving the Change of Control application, the OCC expressly approved and agreed to implementation of this business plan as the very premise of the planned acquisition and capital infusion.
>
> . . . .
>
> 50. The application and materials submitted by Sinclair also outlined in detail the way in which the Bank proposed to enter into a relationship with Sinclair's prior company to generate such bulk loan purchases. At the time Sinclair submitted his application for Change of Control, he had sold that company to Clarence Stevens. After Stevens' purchase,

> the name of the company was changed to Stevens Financial Group, Inc. ("SFGI").
>
> . . . .
>
> 52. But for the OCC's approval of and agreement to the business plan, loan techniques and lending program outlined in detail by Sinclair in the materials submitted with his application, Sinclair would not have purchased SNB or entered into the agreement with the OCC to maintain specified, enhanced capitol ratio levels, or made an investment of nearly $5 million, including a capital infusion of $2 million to the Bank. . . .
>
> . . . .
>
> 67. The OCC also began to criticize the "reserves" required by SNB and the repurchase or replacement requirement, both of which constitute credit enhancements that add to the security of the loan purchase agreement and do not detract in any way from the Banks's [*sic*] reliance on the underlying individual credit and security of each borrower effected through employment verification, loan repayment history (*i.e.*, "seasoning" of the loan) and other criteria. Such reserves are an inherent aspect of the bulk purchase program, as disclosed in the application process. The OCC's post-agreement construction of a purchase of a loan pool (with credit analysis performed by the bank of each borrower) as a single loan to the pool seller, simply because the seller was providing credit enhancement (and thereby further reducing risk to the bank) is but an after-the-fact rationalization by the OCC to thwart this Bank from carrying out its business plan. . . . Moreover, this is the same program that was disclosed, reviewed, approved and agreed to by the OCC prior to Sinclair's outlay of millions of dollars and prior to his capital commitment. In all events, the loans subject to this pretextual challenge by the OCC were performing well at the time.

Compl. ¶¶ 2, 5, 30, 47, 50, 52, 67.

4. Plaintiff's counsel acknowledges that this case is a "new generation of *Winstar* kind of case." Transcript of Proceedings, *Damian Sinclair v. United States*, No. 00–598C, at 16 (Fed.Cl. Feb. 27, 2001).

Notwithstanding these impediments to success, plaintiff is not foreclosed completely from maintaining an action premised on an implied-in-fact agreement. The plaintiffs in *Winstar* and *Glass* were able to point to the specific regulatory treatment of goodwill as the basis of their respective bargains with the Government. While plaintiff has yet to make a similar showing,[5] dismissal of this action is not appropriate. Through discovery plaintiff may be able to show an agreement within the strictures of *Winstar* and its progeny, to wit, an agreement that contemplated (1) a specific regulatory forbearance by the overseeing agency (2) with respect to a specific activity (3) for a stipulated period of time. For example, plaintiff may establish that the OCC agreed to allow him to purchase bulk loans from SFGI without the OCC asserting a loan-to-one borrower rule violation for an agreed-upon period of time in exchange for plaintiff's maintenance of certain capital ratios. Such an agreement would give rise to a host of objections,[6] but likely would establish the elements of an implied-in-fact contract of species *Winstar*. Setting forth the elements of such an agreement, as plaintiff has done, is sufficient to survive a motion to dismiss.

It also would be premature to dismiss plaintiff's promissory estoppel claim. *See* Compl. ¶ 26. "[I]n order for the theory of promissory estoppel to apply, a plaintiff must demonstrate that, in reliance upon the alleged promise of the defendant, plaintiff acted in a manner which the promissor should have reasonably expected and was damaged by the promissor's breach of the promise." *Radioptics, Inc. v. U.S.*, 223 Ct.Cl. 594, 624, 621 F.2d 1113, 1129 (1980) (emphasis omit-

ted). Discovery is necessary to determine whether the OCC made an actionable promise and whether plaintiff acted consistent with the OCC's reasonable expectations.[7]

■ The denial of defendant's motion is predicated on plaintiff's setting forth the elements to support a plausible implied-in-fact contract. *Glass* and the Federal Circuit's recent opinion in *California Federal Bank v. United States*, 245 F.3d 1342 (Fed.Cir.2001), establish that "consider[ing] contemporaneous documents and surrounding circumstances," *id.* at 1346, is appropriate when attempting to discern the existence of a regulatory forbearance contract. However, insofar as the nature of the undertaking by the Government is concerned, the court respectfully disagrees with the holding in *Glass* to the extent that it stands for the proposition that a non-disapproval of a proposed course of action can suffice to establish acceptance of a contract.

Plaintiff has averred an express oral undertaking by Mr. Bodnar and, consequently, the OCC. In light of this representation, the prudent course is to allow plaintiff latitude in his pleadings, await an appellate ruling in *Glass*, and permit discovery to go forward.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

Defendant's motion to dismiss is denied without prejudice to renewal as a motion for summary judgment, and defendant shall re-

---

**5.** Plaintiff must make such a showing. It would have been, to borrow the Supreme Court's reaction, "madness" for the OCC to enter an agreement that would require payment of damages in the event that any regulatory action by the OCC interfered with plaintiff's implementation of his own business plan. *See Winstar*, 518 U.S. at 864, 116 S.Ct. 2432.

**6.** One such objection, already raised by defendant, is the lack of authority on the part of OCC officials to enter into such an agreement. At this stage in the proceedings, however, plaintiff is not required to establish that OCC officials had the requisite authority. "It [is] sufficient for the complaint to allege that the government's prom-

ise was authorized by a person having legal authority to do so," *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1380 (Fed.Cir.2001) (reversing grant of motion to dismiss), and plaintiff has done so. *See* Compl. ¶ 11 ("[T]he OCC is empowered to enter into agreements with acquirers of national banks stipulating the terms and conditions upon which such acquirers may purchase a national bank, and the concomitant powers that the OCC will permit the acquirer to exercise after it has acquired a particular national bank.").

**7.** Plaintiff's takings theory need be addressed only if he fails on his contract claim.

spond to the complaint within the time provided for by rule.