Damian **SINCLAIR**, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 00–598C.

United States Court of Federal Claims.

April 18, 2003.

Helen Davis Chaitman, New York City, for plaintiff.

David F.D'Alessandris, Washington, DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. Robert M. Clark, Office of the Comptroller of the Currency, of counsel.

**OPINION**

MILLER, Judge.

This case comes for decision on defendant's motion for summary judgment. Plaintiff lender argues that the Government breached its contract with him. Having not disapproved his acquisition of a small national bank, plaintiff contends that the Government agreed to his proceeding with a business plan to offer sub-prime loans. Defendant rejects the proposition that a contract was formed, denying that a meeting of the minds occurred. It is defendant's position that the regulatory activities to which plaintiff's banking activities were subject do not satisfy the prerequisites for an implied-in-fact contract and, in any event, that the regulatory personnel with whom plaintiff dealt lacked authority to bind the Government. Argument on this second dispositive motion is deemed unnecessary.

**FACTS**

The following facts are undisputed, unless otherwise noted. The facts are drawn from plaintiff's complaint, the proposed findings of fact, plaintiff's certification, and the court's earlier opinion in this matter. *See Sinclair v. United States,* 49 Fed.Cl. 274 (2001) (denying motion to dismiss and allowing plaintiff to establish facts supporting forbearance from regulation, authority, and claim for promissory estoppel).

Damian Sinclair ("plaintiff") sought to acquire the Northwest National Bank ("NWNB"), a small national bank in Arkansas. Although he possessed more than 30 years' experience in consumer finance, plaintiff "had no background in traditional banking and no experience working with bank regulators." Certification of Damian Sinclair, Jan. 7, 2003, ¶ 4 ("Sinclair Cert.").

The Office of the Comptroller of the Currency (the "OCC") is the agency within the United States Department of the Treasury charged with supervising national banks and with enforcing the Change in Bank Control Act of 1978, 12 U.S.C. § 1817(j) (2003) (the "CBCA"), the statute governing changes in ownership of national banks. Accordingly, plaintiff met with officials from the OCC on

December 14, 1999, to discuss his proposed acquisition of NWNB.[1]

Based on his past success in implementing such programs, plaintiff presented a business plan whereby NWNB would focus on sub-prime lending to low-income and minority borrowers. Plaintiff alleges that the OCC staff present at the December 14, 1999 meeting indicated that, subject to the necessary application to the OCC, they "had no problem, in concept," with plaintiff's proposed business plan. Compl. filed Oct. 4, 2000, ¶ 16.

Approximately one week after the meeting, plaintiff submitted a letter of intent, dated December 23, 1999, to Kim Hendren, NWNB's Chairman, that confirmed plaintiff's plan to acquire 100% of NWNB's common stock at $34.375 per share, for a total purchase price of approximately $2.75 million. Plaintiff executed this letter on December 24, 1999, and Mr. Hendren did the same on December 29, 1999.

Pursuant to 12 U.S.C. § 1817(j)(1) of the CBCA, plaintiff was required to file a notice with the OCC detailing, *inter alia,* certain personal, business, and financial information about the bank acquirers; the terms of the proposed acquisition; and the source of the funds to be used in purchasing the bank. The CBCA also requires the disclosure of any plans to "make any other major change in [the target bank's] business or corporate structure or management." 12 U.S.C. § 1817(j)(6)(E).

On or about December 31, 1999, plaintiff filed the required notice with the OCC. Karen H. Bryant, Acting Licensing Manager for the OCC's Southwestern District Office, was the OCC official directly in charge of evaluating his notice. *See* Sinclair Cert. ¶ 5. Included in the notice were details regarding plaintiff's proposed three-year business plan for NWNB. Plaintiff summarizes this plan as

follows: (1) NWNB would invest approximately 440% of its capital in used car loans and 300% of its capital in manufactured home loans; (2) it would purchase the loans in bulk from Stevens Financial Group, Inc., a company formerly owned by plaintiff, but sold prior to submitting the change-in-control notice; and (3) Stevens Financial would post a 10% reserve to protect NWNB against losses on the purchased loans and would service the loans for a fee. *See* Pl.'s Resp. to Def.'s Proposed Finding of Fact No. 1, filed Jan. 15, 2003.

After submitting the change-in-control notice, plaintiff supplemented it with "voluminous materials," Sinclair Cert. ¶ 8, as well as with additional correspondence, in–person presentations, and telephonic communications. He also responded to "scores of questions" asked by the OCC, believing that the additional information requested by OCC indicated that the agency was evaluating plaintiff's notice "carefully in order to make the decision as to whether it would allow [plaintiff] to carry out the business plan." *Id.* ¶ 13.

The OCC was required to investigate plaintiff's change-in-control notice to determine whether grounds existed to disapprove the proposed transaction. *See* 12 U.S.C. § 1817(j)(2)(B). Unless it invokes certain prescribed exceptions, the OCC is allowed 60 days within which to issue a "notice disapproving the proposed acquisition."[2] 12 U.S.C. § 1817(j)(1). The pertinent regulations also allow the OCC to inform the notificant if it disapproves an acquisition, or if it elects not to do so. *See* 12 C.F.R. § 5.50(f)(3)(iii) (2003). If the OCC fails to act during the 60–day period, the acquisition may proceed. 12 U.S.C. § 1817(j)(1). Under this statutory framework, the OCC had until approximately March 1, 2000, to act on plaintiff's notice.

---

1. Defendant maintains that plaintiff made an offer to purchase NWNB on December 10, 1999, four days before meeting with OCC officials, and that the purpose of the December 14 meeting was to discuss the paperwork necessary to buy the bank. Plaintiff denies that he made an offer previous to meeting with OCC personnel. Instead, he portrays the purpose of the meeting as exploring whether the OCC would permit a small

national bank to implement plaintiff's proposed business plan.

2. The parties dispute whether the OCC "approves" proposed transactions under the statute, or whether the agency is limited to "not disapproving" such actions. The court resolves this syntactical impasse in its discussion of plaintiff's contract theory.

On February 28, 2000, plaintiff spoke by telephone with John A. Bodnar, the District Deputy Controller for the OCC's Southwestern District Office and the senior OCC official responsible for assessing plaintiff's notice to acquire NWNB. According to plaintiff, Mr. Bodnar indicated that he would not allow a national bank to make loans " 'to those kind of people,' " [3] Sinclair Cert. ¶ 15, causing plaintiff to believe that, "at that point, the entire deal was off," *id.* ¶ 16. Mr. Sinclair acknowledged the conversion in an e-mail sent later that day, in which he informed Mr. Bodnar that, during a previous attempt to acquire a state-chartered bank, the Federal Deposit Insurance Corporation (the "FDIC") had informed plaintiff that it might require additional capital if plaintiff wanted to implement a business plan centered on sub-prime lending. The e-mail indicated that plaintiff would agree to a higher capital requirement if given the opportunity to have that requirement reduced based on the future performance of NWNB and the loans.

Mr. Bodnar telephoned plaintiff on February 29, 2000, to advise that, if plaintiff would agree to holding additional capital,[4] he should make this commitment in writing and submit it to the OCC. Plaintiff sent a "commitment letter," via facsimile transmission, to the OCC on March 1, 2003, wherein he identified certain minimum capital ratios that NWNB would maintain. Plaintiff argues that these ratios "were 150–200% higher than the minimum capital levels required under existing OCC regulations." Sinclair Cert. ¶ 15. The letter also indicated plaintiff's "understanding that upon receipt of this letter today, [the OCC] will be both faxing and mailing the OCC approval[,]dated February 29, 2000[,]" of plaintiff's acquisition of NWNB.

The OCC responded with a letter, dated February 29, 2000,[5] conveying the OCC's "intent not to disapprove of the proposed change in control." The OCC's letter stated

that its conclusion was "[b]ased upon a thorough review of all information available, including representations and commitments made in the notice." Noting that the OCC had not received information in response to certain requested background checks, the letter reserved the OCC's right to "consider remedies available to [it] under the Change in Bank Control Act or other statutes, if adverse or previously withheld information is received." Ms. Bryant signed the letter on behalf of the OCC.

Behind-the-scenes actions occurred during the final stages of the process culminating in the issuance of the non-disapproval letter. On March 1, 2000, Brenda McNeese, Ms. Bryant's assistant, sent an e-mail to Stephen Corona, an employee in the OCC's Credit Risk Division, who plaintiff calls an "expert on sub[-]prime lending." *See* Sinclair Cert. ¶ 18. Ms. McNeese stated that Mr. Bodnar had received several telephone calls from an unidentified congressional aide on February 29, 2000, demanding to know why the OCC had not acted on plaintiff's application. She reported that Mr. Bodnar telephoned Mr. Sinclair in response to this inquiry and proposed the increased capital ratios. After this conversation Mr. Bodnar discussed with Ms. McNeese whether "any other issues were outstanding." According to the e-mail, when Ms. McNeese replied that there were "not any that would cause [the OCC] to deny the application," the OCC issued the non-disapproval letter.

Ms. McNeese ended her e-mail with a request that Mr. Corona continue reviewing the application. She also advised Mr. Corona that any of his comments or suggestions would be addressed "during the supervisory process instead of the licensing process."

On March 8, 2000, Cottrell L. Webster, a Regional Director for the FDIC, sent Mr. Bodnar a letter expressing the FDIC's "disappoint[ment] [that its] formal written con-

---

**3.** This statement's impact on plaintiff's legal argument is discussed *infra* note 13.

**4.** The OCC has authority to request a bank to hold higher capital levels than normally required for reasons including exposure to risks arising from concentrations of credit and "nontraditional activities." *See* 12 C.F.R. § 3.10(d) (2003).

**5.** "Apparently, the OCC released the February 29, 2000 letter on March 1, 2000, after receipt of plaintiff's March 1, 2000 commitment letter." *Sinclair,* 49 Fed.Cl. at 276.

cerns were not considered regarding the decision [to approve plaintiff's notice], especially in light of the significant concerns [the FDIC had] with the proposal." Ms. McNeese had requested the FDIC's comments regarding plaintiff's notice in mid-February, and the FDIC had expressed some of its concerns during a telephone call with Ms. McNeese on February 25, 2000. Mr. Webster's letter detailed several areas in plaintiff's business plan that raised "significant concerns," including the insufficiency of the proposed capital level and the lack of written loan administration procedures and guidelines. In closing, Mr. Webster asked for "better cooperation" between the two agencies, especially regarding "the timeliness of the sharing of information and [the] formal consideration of comments and concerns" expressed by the FDIC.

After receiving the OCC's non-disapproval letter, plaintiff completed the acquisition of NWNB, changing the bank's name to Sinclair National Bank ("SNB") on March 7, 2000. Plaintiff states that he infused an additional $2 million into the bank after its acquisition. *See* Sinclair Cert. ¶ 17:

On April 24, 2000, two OCC employees, Kevin Russell and Nancy Haynes, paid an on-site visit to SNB. According to plaintiff, Mr. Russell indicated, at the close of the visit, that he was concerned about a potential violation of the "loan-to-one borrower" rule, *see* 12 U.S.C. § 84 (2003), based on the nature of SNB's relationship with Stevens Financial, the entity that sold the loans in bulk to SNB.[6] On or about May 3, 2000, the OCC advised plaintiff that there appeared to be a serious violation of the rule; pending an investigation, plaintiff was to refrain from purchasing additional loans from Stevens Financial. The OCC informed plaintiff on or about May 17, 2000, that it intended to order corrective action to remedy the violation of the loan-to-one-borrower rule and that it appeared plaintiff had violated the legal lending limit.

F. Christian Dunn, the OCC's Assistant Deputy Comptroller, sent a letter to SNB's board of directors on May 17, 2000, that

detailed specific violations of the loan-to-one borrower rule. Mr. Dunn stated that "four pools" purchased from Stevens Financial violated the legal lending limit and threatened to require SNB to divest all of the $5 million in loans already purchased by the bank. Plaintiff accuses the OCC of forcing plaintiff into "a difficult Hobbsian choice because of the potential impact on portfolio value as a result of [SNB] being ordered to sell off its entire portfolio in this way." Compl. ¶ 68. On June 9, 2000, Mr. Dunn sent the SNB board a letter summarizing the OCC's findings from its April 24, 2000 on-site visit and advising that SNB's risk assessments "were being updated and increased in virtually every category," *id.* ¶ 79, even though SNB had been operating its business plan for less than two months. The OCC submitted a deficiency notice, pursuant to 12 C.F.R. § 30.3(b) (2003), to SNB on June 28, 2000, forcing plaintiff to submit a compliance plan to rectify the bank's failure to meet certain operational standards.

Although SNB made a series of submissions to the OCC over the following months, it was unable to address fully the OCC's concerns. From May 2000 to October 2000, SNB responded to specific OCC inquiries, forwarded opinions from independent counsel on behalf of SNB, scheduled in-person meetings with OCC officials, and submitted original and revised compliance plans. Despite SNB's attempts at compliance, the OCC continued to raise new problem areas in SNB's operations. As of October 4, 2000, the OCC was considering SNB's revised compliance plan, submitted September 6, 2000, and plaintiff predicted that "[a] major safety and soundness exam is scheduled which will, with certainty, lead to a plethora of new contrivances." Compl. ¶ 102.

Plaintiff filed his complaint in the United States Court of Federal Claims on October 4, 2000, with a simultaneous action instituted in the United States District Court for the District of Columbia on the same date. Count I of the instant complaint alleges that "the conduct of the OCC in contravention of the agreement of March 1, 2000, constitutes an

---

6. Plaintiff alleges that he disclosed, in the business plan he submitted to the OCC, the proposed relationship between the bank and Stevens Financial. *See* Compl. ¶ 64.

abrogation and breach of plaintiff's contract rights by the United States," Compl. ¶ 108, and seeks damages for such breach. Count II seeks restitution for the alleged breach, Count III seeks restitution for repudiation and anticipatory breach of the alleged contract, and Count IV seeks restitution on the theory of promissory estoppel. Count V alleges frustration of purpose, and Count VI seeks just compensation for a taking of plaintiff's property in violation of the Fifth Amendment.

## DISCUSSION

The court's previous opinion, *Sinclair*, 49 Fed.Cl. 274, confirmed the court's jurisdiction over plaintiff's complaint and addressed defendant's motion to dismiss all plaintiff's allegations for failure to state a claim. *Id.* at 276–77. Defendant argued that no contract was formed between plaintiff and the OCC, and "characterize[d] the actions of Mr. Bodnar and the OCC as made in furtherance of the OCC's statutory duties to regulate national banks." *Id.* at 277. Plaintiff responded that the negotiations between the parties evidenced a contractual relationship under the rationale of *Winstar Corp. v. United States*, 64 F.3d 1531 (Fed.Cir.1995), *aff'd*, *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). However, plaintiff admitted that his argument that "the alleged contract was formed through approval of an acquisition plan" and that the breach occurred through "the action of agency officials who were charged with overseeing SNB to protect the public interest" stretched the reasoning of *Winstar* and its progeny. *Sinclair*, 49 Fed.Cl. at 279 & n. 4.

This court noted that plaintiffs in the *Winstar* cases were able to "point to the specific regulatory treatment of goodwill as the basis of their respective bargains with the Government." 49 Fed.Cl. at 280. Even though plaintiff had not yet made a similar showing, the court allowed discovery to continue on plaintiff's contract claim, pointing out that the Federal Circuit opinion in *California Federal Bank, FSB v. United States*, 245 F.3d 1342 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002) ("*Cal Fed*"), and the trial court decision in *Glass v. United States*, 44 Fed.Cl. 73 (1999),[7] established that it was appropriate to consider " 'contemporaneous documents and surrounding circumstances' " when discerning the existence of a regulatory forbearance contract. *Sinclair*, 49 Fed.Cl. at 280 (quoting *Cal Fed*, 245 F.3d at 1346).

Thus, plaintiff was afforded the opportunity to "show an agreement within the strictures of *Winstar* and its progeny, to wit, an agreement that contemplated (1) a specific regulatory forbearance by the overseeing agency (2) with respect to a specific activity (3) for a stipulated period of time." *Sinclair*, 49 Fed.Cl. at 280. In order for his contract cause of action to survive, plaintiff was required to make such a showing, because it would have been " 'madness' for the OCC to enter an agreement that would require payment of damages in the event that any regulatory action by the OCC interfered with plaintiff's implementation of his own business plan."[8] *Id.* at 280 n. 5 (quoting *Winstar*, 518 U.S. at 864, 116 S.Ct. 2432). Defendant's motion to dismiss was denied in full without prejudice to renewal as a motion for summary judgment. *Id.* at 280.

### 1. *Summary judgment standards*

RCFC 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

---

**7.** This court respectfully disagreed with the trial court's decision in *Glass*, "to the extent that it stands for the proposition that a non-disapproval of a proposed course of action can suffice to establish acceptance of a contract." *Sinclair*, 49 Fed.Cl. at 280. The impending appellate ruling in *Glass* supplied another reason for allowing "plaintiff latitude in his pleadings." *Id.* at 280.

The Federal Circuit issued its decision in *Glass* subsequent to this court's earlier opinion. The impact of the appellate decision on plaintiff's contract argument is discussed *infra* note 9.

**8.** The court also ordered discovery to continue on plaintiff's promissory estoppel cause of action and noted that plaintiff's "[t]akings theory need be addressed only if he fails on his contract claim." *Sinclair*, 49 Fed.Cl. at 280 n. 7.

the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In opposing summary judgment, the nonmoving party may not rest on mere allegations, but "must come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). Any evidence presented by the nonmoving party is to be believed, *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, and "all applicable presumptions, inferences, and intendments" are to be drawn in his favor, *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984). Any doubt over factual issues must be resolved in favor of the opponent. *Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348.

Although defendant's motion with respect to plaintiff's claim based on promissory estoppel implicates the court's jurisdiction, it can be addressed under the rubric of summary judgment. *See Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991).

### 2. *Contract claims*

In its motion for summary judgment, defendant forwards essentially the same contention as presented in its earlier motion to dismiss: The OCC's actions regarding plaintiff's application were regulatory in nature and did not give rise to a contract. "[A] [f]ederal agency that considers and ultimately decides not to disapprove a notice filed pursuant to a statutory or regulatory requirement does not, simply by electing not to disapprove the notice, provide contractual protection against the enforcement of any [relevant] regulation." Def.'s Br. filed Nov. 25, 2002, at 13.

Plaintiff responds that his negotiations with the OCC gave rise to an implied-in-fact contract, whereby plaintiff, in exchange for agreeing to hold the elevated capital ratios and to invest $2 million into SNB, was able to implement his business plan unfettered by regulatory interference from the OCC. Plaintiff maintains that this framework satisfies the requirements for an implied-in-fact contract under *Anderson v. United States,* 47 Fed.Cl. 438 (2000), *consolidated appeals docketed,* Nos. 03–5009 & –5030 (Fed.Cir. Nov. 1 & 27, 2002); and *Glass v. United States,* 44 Fed.Cl. 73 (1999), *rev'd-in-part, vacated-in-part, and remanded,* 258 F.3d 1349 (Fed.Cir.), *amended by* 273 F.3d 1072 (Fed.Cir.2001).[9] Plaintiff claims the OCC breached this contract by launching an investigation into plaintiff's post-acquisition business practices.[10]

In its earlier opinion on defendant's motion to dismiss, the court noted that *Anderson* is not on point. *See Sinclair,* 49 Fed.Cl. at 278 n. 2 ("Defendant assumed the existence of a contract in *Anderson* .... Thus, *Anderson* and the cases cited therein ... provide no guidance as to whether a contract was formed at all."). The court also addressed *Glass,* an iteration of the numerous *Winstar* claims filed in the Court of Federal Claims.

The Supreme Court in *Winstar* affirmed the Federal Circuit's ruling that the Government had entered into express contracts with three healthy savings and loan plaintiffs. *See* 518 U.S. at 860–62, 116 S.Ct. 2432. In exchange for acquiring failing thrifts (thereby saving the Government the cost of subsidizing them), the healthy thrifts received a promise from the Government that they would receive certain regulatory forbearances, *i.e.,* the use of purchase–method accounting and the ability to amortize a specified amount of supervisory goodwill over a stated number of years to satisfy regulatory capital requirements. This prom-

**9.** The Federal Circuit's decision in *Glass* did not address whether a contract was formed between the Government and plaintiffs. Instead, the appeals court concluded that plaintiff shareholders were not third-party beneficiaries of the alleged contract, 258 F.3d at 1355, and that the FDIC had presented a non-justiciable claim, *id.* at 1356. The appeals court remanded for a deter-

mination regarding any surviving claims presented by plaintiffs. *Id.*

**10.** *See Sinclair,* 49 Fed.Cl. at 278 n. 3, for a recitation of the allegations from plaintiff's complaint that undergird his breach-of-contract argument.

ise was memorialized in various written agreements with the Federal Savings and Loan Insurance Corporation and the Federal Home Loan Bank Board ("FHLBB"). The agreements contained integration clauses that incorporated the contemporaneous writings of the parties. The Court held that the writings of the parties, coupled with the documentation incorporated through the integration clauses, evidenced express contractual agreements between the Government and plaintiff thrifts.

Although the Government could not make a binding contract to agree not to exercise a sovereign power, the Supreme Court concluded that the Government " 'can agree in a contract that if it does so, it will pay the other contracting party the amount by which its costs are increased by the Government's sovereign act.' " *Winstar,* 518 U.S. at 881–82, 116 S.Ct. 2432 (quoting *Amino Bros. Co. v. United States,* 178 Ct.Cl. 515, 372 F.2d 485, 491 (1967)). When Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 ("FIRREA"), it disallowed the use of the forbearances promised to the healthy thrifts. Thus, the Court held that the passage of FIRREA breached the Government's express contracts with plaintiffs.

The trial court decision in *Glass,* 44 Fed. Cl. 73, applied this principle to implied-in-fact contracts between thrifts and the Government.[11] The Government in *Glass* contended that no contract was formed and that the forbearances granted to the acquiring thrift were a matter of "regulatory grace." *Id.* at 76. However, the court concluded that plaintiff's change–in–control notice (requesting eight forbearances and proposing a business plan); the Government's June 18, 1986 written response (modifying, approving, or denying seven of the eight requested forbearances and requesting FHLBB approval of certain aspects of the transaction); plaintiff's operat-

ing agreement (promising to adhere to the business plan); the FHLBB resolution (conditionally approving the transaction); and the "course of conduct by regulators" sufficed to show an implied-in-fact contract whereby plaintiff agreed to "effect the acquisition and recapitalization of [the failing thrift], in exchange for certain regulatory treatment." *Id.* at 77.

This court observed in its earlier opinion that "[e]xtending *Winstar's* approach to this case, as envisioned by plaintiff, could transform any disagreement with agency exercise of its regulatory authority into a contract action," *Sinclair,* 49 Fed.Cl. at 279. Accordingly, the court directed the showing that plaintiff must make in order to sustain his contract theory: "[A]n agreement that contemplated (1) a specific regulatory forbearance by the overseeing agency (2) with respect to a specific activity (3) for a stipulated period of time." *Id.* at 280.

■ Although plaintiff has had the benefit of more than a year of discovery, the record is insufficient to satisfy the court's directive. Plaintiff cannot bring his claim within the ambit of *Winstar,* as he is unable to show that the negotiations surrounding his acquisition of NWNB gave rise to an implied-in-fact contract. An implied-in-fact contract is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. v. United States,* 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923). To prove the existence of an implied-in-fact contract with the Government, a party must show consideration, lack of ambiguity in offer and acceptance, mutuality of intent to contract, and actual authority on the part of the agency

11. Subsequent to the trial court decision in *Glass,* the Federal Circuit issued *Cal Fed,* 245 F.3d 1342, confirming that factual indicia of contractual intent could evidence an enforceable implied-in-fact contract between a thrift and the Government. Although the parties in *Cal Fed* had not executed an assistance agreement containing an integration clause, the Federal Circuit determined that " 'if the factual records of indi-

vidual cases show intent to contract with the [G]overnment for specified treatment of goodwill, and documents such as correspondence, memoranda, and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] … should be irrelevant to the finding that a contract existed.' " 245 F.3d at 1347 (quoting *California Federal Bank, FSB v. United States,* 39 Fed.Cl. 753, 773 (1997)).

representative to bind the Government.[12] *Maher v. United States*, 314 F.3d 600, 606 (Fed.Cir.2002).

■ The contract sponsored by plaintiff lacks consideration. Plaintiff argues that the agreement was supported by adequate consideration, insofar as the OCC benefitted from the addition of $2 million into a "failing" national bank, *see* Pl.'s Br. filed Jan. 15, 2003, at 16, and from a written agreement to maintain the elevated capital levels. Plaintiff, in return, received a promise to carry out his proposed business plan free from regulatory interference if that plan proved successful.[13]

The "benefits" received by the OCC cannot be characterized as consideration. The OCC may require, pursuant to 12 C.F.R. § 3.10(d), that a bank hold additional capital to counterbalance risks associated with nontraditional banking activities. "Performance of a pre-existing legal duty is not consideration." *Allen v. United States*, 100 F.3d 133, 134 (Fed. Cir.1996) (citing Restatement (Second) of Contracts § 73 (1981)).

Moreover, plaintiff "has failed to identify any consideration received from the OCC." Def.'s Br. filed Nov. 25, 2002, at 23. Earlier in this litigation, plaintiff contended that he had received promises of forbearance from the OCC. In his July 23, 2001 response to defendant's interrogatory no. 7, plaintiff stated that he received a promise from the OCC that he could implement his business plan for up to three years "without being subject to the issuance of statutory or regulatory provisions, rules, guidelines or other decrees by the United States government ... that would have the effect of making it impossible for SNB to carry out [plaintiff's] business plan." When ordered to supplement this response by the court, plaintiff admitted, in a November 6, 2001 letter to defense counsel, that he could not recollect "any oral statement [made] to him by an employee or officer of the OCC in which the person identified a specific statute or regulation by number and stated that the OCC would forbear from enforcing that statute or regulation."

In his most recent filing with the court, however, plaintiff argues that, because the OCC did not identify a regulation or statute violated by plaintiff's business plan, "there was no need for forbearance." Pl.'s Br. filed Jan. 15, 2003, at 18. Absent evidence of forbearance by the OCC, however, plaintiff cannot show that he had an enforceable contract with the OCC. *See, e.g., Winstar* 518 U.S. at 848, 116 S.Ct. 2432 ("[T]he principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations."); *Cal Fed*, 245 F.3d at 1347 ("[G]overnment bargained with [plaintiff thrift] to assume the net liabilities of the acquired thrifts in ex-

---

12. *Winstar* and its progeny do not obviate the need for plaintiff to prove the relevant elements of a contract when arguing that a government agency's actions exceeded its regulatory purview. The Supreme Court's analysis in *Winstar* adhered to "ordinary principles of contract construction and breach." 518 U.S. at 870–71, 116 S.Ct. 2432. Consequently, the Federal Circuit and the Court of Federal Claims have applied normal tenets of contract law when reviewing contract claims premised on regulatory activity. *See Cal Fed*, 245 F.3d at 1346–47 (mutual intent to contract, consideration, and authority are of paramount importance in showing contract existed in *Winstar* setting); *Cienega Gardens v. United States*, 194 F.3d 1231, 1246 (Fed.Cir.1998) ("[P]laintiffs in *Winstar* had contracts with integration clauses that expressly incorporated contemporaneous documents that allowed them to use supervisory goodwill and the stated amortization periods."); *First Commerce Corp. v. United States*, 53 Fed.Cl. 38, 47 (2002) (no mutuality of intent to contract existed because plaintiff could

not show that it "would not have acquired the [failing] thrift without the forbearances, or that it bargained for any contractual promises"); *Anchor Sav. Bank, FSB v. United States*, 52 Fed.Cl. 406, 416–20 (2002) (unassisted supervisory transaction did not give rise to enforceable contract because court could not "discern the requisite offer, acceptance and consideration" from meager documentary evidence presented).

13. Mr. Bodnar allegedly stated, during his February 28, 2000 telephone conversation with plaintiff, that he "would 'not allow' one of his national banks to make loans to 'those kind of people.'" Sinclair Cert. ¶ 15. Defendant does not address this allegation in its briefs. When deciding a motion for summary judgment, the court indulges plaintiff's version of his conversation with Mr. Bodnar with a presumption of accuracy. These comments, although extremely disturbing, do not bear on plaintiff's legal argument.

change for favorable regulatory treatment . . . .").

Even though lack of consideration is fatal to plaintiff's argument that a contract was formed, plaintiff also has failed to show a disputed issue as to the other necessary elements of an implied-in-fact contract. Plaintiff argues that he "offered" to agree to adhere to elevated capital requirements and to invest $2 million into SNB and that the OCC "accepted" this offer, as evidenced by the February 29, 2000 non-disapproval letter. Pl.'s Br. filed Jan. 15, 2003, at 15–16. Plaintiff further contends that, because the non-disapproval letter was not required by statute or regulation, it was an "affirmative recognition" of the OCC's contract with plaintiff. *Id.* at 17. Plaintiff also characterizes the letter's reference to the "representations and commitments" made in plaintiff's notice as an integration clause akin to those found in the three transactions at issue in *Winstar.*

Plaintiff's framework for establishing the elements of a contract does not evidence an agreement with definite terms. All of the terms in the alleged contract, as framed by the "offer" and "acceptance," are ambiguous, including the duration and the obligations of both parties. *See* Pl.'s Br. filed Jan 15, 2003, at 19 (The contract "simply required an exercise of discretion by the officials with responsibility to supervise national banks."). Moreover, plaintiff mischaracterizes the nature of the non-disapproval letter: Although the OCC is not required to issue such a letter, it may do so pursuant to 12 C.F.R. § 5.50(f)(3)(iii). The letter thus represents an exercise of regulatory authority and nothing more.

The non-disapproval letter's putative integration clause also does not resemble those in the *Winstar* transactions. The integration clause that appeared in the Supervisory Action Agreement governing the Glendale transaction read. as follows: "This Agreement . . . constitutes the entire agreement between the parties thereto and supersedes all prior agreements and understandings of the parties in connection herewith, excepting only the Agreement of Merger and any resolutions or letters issued contemporaneously herewith." 518 U.S. at 862, 116 S.Ct. 2432.

In contrast, the language in the non-disapproval letter that plaintiff's deems an integration clause explains that the OCC decided not to disapprove the acquisition "[b]ased upon a thorough review of all information available, including representations and commitments made in the [change-in-control] notice." This sentence makes no reference to an agreement or contract of any sort; rather, it appears as boilerplate language in many of the non-disapproval letters issued by the OCC. *See, e.g.,* Non-disapproval letter issued to Paul J. Schroeder, Jr., dated July 22, 1998, *available at* http://www.occ.treas.gov/interp/aug98/cd98–38.pdf. Such language cannot integrate contemporaneous documents into an alleged contract.

Finally, plaintiff raises no genuine issue of material fact as to the authority of relevant OCC personnel to bind the Government. Plaintiff argues that Mr. Bodnar, in his position as district deputy comptroller, had authority to enter into contracts and did so through his telephone conversations with plaintiff on February 28 and 29, 2000. Plaintiff submits an email, dated February 14, 2000, from Ms. McNeese, Ms. Bryant's assistant, to Crystal Maddox, an employee in the OCC's Washington, DC office. Ms. McNeese indicated that she was working on plaintiff's change-in-control notice and queried whether, because of plaintiff's plan to implement sub-prime lending, the application would be "non[-] delegated." Plaintiff contends that this question evidences that the OCC, before issuing the non-disapproval letter, "concluded that Mr. Bodnar had authority to negotiate a final agreement with [plaintiff.]" Sinclair Cert. ¶ 14.

Plaintiff also argues that Mr. Bodnar's and Ms. Bryant's job-related duties imbued them with contractual authority. In her capacity as a licensing officer, Ms. Bryant "had authority to approve or disapprove applications for change in control." Pl.'s Br. filed Jan. 15, 2003, at 19. Mr. Bodnar, as deputy comptroller, "had senior authority for the supervision of the banks within his district." *Id.* at 20. This authority included the power to set capital concentration levels and to approve outside loan servicing agreements. "Together, [Ms.] Bryant and [Mr.] Bodnar had the

authority to approve [plaintiff's] application for change in control with conditions and those conditions are binding on the OCC." *Id.*

To bolster his authority argument, plaintiff submits the declaration of Robert L. Clarke, Comptroller of the Currency from 1985–1992 and the attorney representing plaintiff from 2000–2001 in his interactions with the OCC. Mr. Clarke states that, during the period when he served as comptroller, the district deputy comptroller, *i.e.,* Mr. Bodnar's position, "clearly had the authority on behalf of the OCC to approve, or not to object to, Notice of Change of Control with conditions, and I expect that was still the case in 2000." Certification of Robert L. Clarke, Jan. 6, 2003, ¶ 7.

Defendant responds with the declaration of Annelie M. Kuhn, the Assistant Director, Operations, of the OCC's Acquisition Management Division. Ms. Kuhn, who has personal knowledge of the statutes, regulations, and policies of the Department of the Treasury, avers that district deputy comptrollers and licensing managers "are not normally within the group of personnel to whom contracting officers' warrants would be issued." Declaration of Annelie M. Kuhn, Nov. 21, 2002, ¶ 5.

In assessing plaintiff's argument and his supporting documentation, it is apparent that plaintiff confuses authority to disapprove a change-in-control notice with authority to contract. While Ms. Bryant has authority to decide whether to disapprove a change-in-control application, *see* 12 U.S.C. § 1817(j), and Mr. Bodnar may condition a decision not to disapprove a proposed change in control on the bank's holding elevated capital ratios, *see* 12 C.F.R. § 3.10(d), this statutory and regulatory authority does not vest these OCC employees with authority to contract.

Plaintiff next presents a creative statutory argument which, he claims, supports the proposition that Mr. Bodnar and Ms. Bryant possessed contractual authority. Plaintiff contends that, when FHLBB's supervision of federally insured savings institutions was transferred to the Office of Thrift Supervision (the "OTS") after the enactment of FIRREA, the OTS must have obtained FHLBB's "'ample statutory authority'" to enter into

binding contracts. Pl.'s Br. filed Jan. 15, 2003, at 18 (quoting *Winstar,* 518 U.S. at 890, 116 S.Ct. 2432). According to plaintiff, 12 U.S.C. § 1 (2003) grants the Comptroller of the Currency the same authority over matters in his jurisdiction as that possessed by the Director of the OTS; thus, the argument goes, OCC personnel must have authority to contract.

The statutory predicate of plaintiff's argument is deficient. 12 U.S.C. § 1 grants the Comptroller the same authority as that possessed by the OTS Director under 12 U.S.C. § 1462a(b)(3) (2003). The latter provision precludes the Secretary of the Treasury from intervening in any matter pending before the Director of the OTS, except as provided by law. Plaintiff makes no attempt to show how the right of the Comptroller to be free from interference from the Secretary in pending matters grants OCC district deputy comptrollers and licensing managers the authority to bind the Government while performing their regulatory functions.

Plaintiff then attempts to avoid the absence of authority by contending that "the OCC clearly ratified the agreement by accepting its benefits." Pl.'s Br. filed Jan. 15, 2003, at 19. He cites *City of El Centro v. United States,* 17 Cl.Ct. 794 (1989); and *Silverman v. United States,* 230 Ct.Cl. 701, 679 F.2d 865 (1982), in support of his argument. Regarding *City of El Centro,* plaintiff neglects to advise that this decision was reversed by the Federal Circuit, *see* 922 F.2d 816 (Fed.Cir.1990), on the issues of contractual authority and ratification. The former United States Claims Court had held that an implied-in-fact contract was created between the United States Border Patrol and a hospital which cared for several illegal aliens injured as a result of a thwarted attempt to cross the border between Mexico and the United States. The Claims Court determined that the Border Patrol agent sent to the hospital to coordinate relief efforts possessed authority to bind the Government to pay for the aliens' medical care. If the agent did not have such authority, the agent's supervisors were aware of the agent's conversations with hospital personnel regarding payment for the hospital costs. Because the

supervisors did not seek to dispel the idea that the Government would pay for the treatment, plaintiff argued that "some type of 'institutional ratification'" had occurred. 922 F.2d at 821.

The Federal Circuit disagreed, concluding that there was "no express promise [ ] by an official empowered to bind the Government to pay for the care rendered. [Plaintiff] has not shown that any individual with contracting authority exercised that authority to bind the United Stated in this matter." *City of El Centro*, 922 F.2d at 821. In discussing plaintiff's ratification argument, the appeals court distinguished *Silverman*. According to the Federal Circuit, *Silverman* involved an official from the Federal Trade Commission (the "FTC") "who had authority to approve vouchers for payment for goods and services;" thus, his promise to pay a contractor gave rise to an implied-in-fact contract, which was ratified by the FTC when it accepted the benefits received from the official's promise of payment. *Id.* (citing *Silverman*, 679 F.2d at 868).

Neither *City of El Centro* nor *Silverman* mandates a finding that Mr. Bodnar and/ or Ms. Bryant had authority to contract, or that the OCC ratified the alleged agreement. Plaintiff did not cite to any case law which supports its argument that authority was present or that ratification occurred.

Plaintiff has failed to interpose genuine issues as to consideration, definiteness of contractual terms, or authority. Therefore, the court holds that no contract existed between the OCC and plaintiff. Defendant's motion for summary judgment is granted as to plaintiff's claims for breach of contract, repudiation/ anticipatory breach of contract, and frustration of purpose.[14]

#### 3. *Promissory estoppel claim*

Defendant argues that plaintiff's claim for relief under the doctrine of promissory estoppel must be dismissed because the Court of Federal Claims lacks jurisdiction over an estoppel cause of action. Even if jurisdiction were present, defendant argues, plaintiff has not identified the requisite elements that entitle him to relief. Plaintiff, citing *Radioptics, Inc. v. United States*, 223 Ct.Cl. 594, 621 F.2d 1113 (1980), contends that promissory estoppel is an appropriate basis for relief because he relied on the OCC's "actionable promise" that his business plan could be carried out unfettered by regulation if he maintained the required capital ratios and infused $2 million into his bank. Pl.'s Br. filed Jan. 15, 2003, at 22.

■ In *Radioptics* the Court of Claims expressed "some reservation whether a claim based upon promissory estoppel is within the [Court of Federal Claims's] jurisdiction." 223 Ct.Cl. at 624, 621 F.2d at 1129. The jurisprudence subsequent to *Radioptics* has clarified the court's jurisdiction as to claims premised on estoppel, drawing a distinction between "the doctrine of equitable estoppel, which operates to prevent the denial of a contract that has been made, and the doctrine of promissory estoppel, which creates a contract that otherwise would not exist." *Pacific Gas & Elec. Co. v. United States*, 3 Cl.Ct. 329, 340 (1983), *aff'd*, 738 F.2d 452 (Fed.Cir.1984) (unpublished). "'[P]romissory estoppel is used to create a cause of action, whereas equitable estoppel is used to bar a party from raising a defense or objection it otherwise would have .... *Promissory estoppel is a sword, and equitable estoppel is a shield*.'" *Biagioli v. United States*, 2 Cl.Ct. 304, 307 (1983) (quoting *Jablon v. United States*, 657 F.2d 1064, 1068 (9th Cir. 1981)). This court has no jurisdiction over claims for promissory estoppel, as it requires the finding of a contract implied-in-law against the Government, for which there has been no waiver of sovereign immunity. *Hercules, Inc. v. United States*, 516 U.S. 417, 423–24, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996).

Plaintiff advocates a promissory estoppel theory of recovery, as he has "raised the doctrine of estoppel as a 'sword'-that is, in an

---

**14.** Defendant correctly points out that frustration of purpose is not a valid claim; rather, the doctrine may be pled as a defense in a non-performance action brought against an obligor. *See Far West Fed. Bank, SB v. Office of Thrift Supervi-*sion–Director, 119 F.3d 1358, 1364 (9th Cir. 1997) ("Frustration of purpose is an excuse for non-performance, not a cause of action. *See* Restatement (Second) of Contracts § 265.").

effort to create a cause of action. Specifically, plaintiff[ ] invoke[s] the doctrine of estoppel to establish the existence of a contract upon which to base [his] claim[ ]." *Gregory v. United States,* 37 Fed.Cl. 388, 396 (1997). Accordingly, this court must dismiss plaintiff's claim on jurisdictional grounds.[15] *See* RCFC 12(b)(1).

### 4. *Takings claim*

■ Finally, defendant moves to dismiss plaintiff's takings claim. This theory essentially alleges that the post-acquisition actions of the OCC, by interfering with plaintiff's business plan, "took" plaintiff's property in violation of the Fifth Amendment. Plaintiff's takings theory is not sustainable. The Federal Circuit repeatedly has rejected the proposition that regulatory activity in the banking industry, even when more financially devastating than that suffered by plaintiff, constitutes a taking. For example, in *California Housing Securities, Inc. v. United States,* 959 F.2d 955 (Fed.Cir.1992), the court rejected the argument that the FIRREA-authorized seizure and liquidation of an unhealthy savings and loan by the Resolution Trust Corporation constituted a compensable taking under *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).[16] Because the owner of the thrift did not possess the right to exclude the Government from its property and, hence, to prevent the imposition of receivership, it did not develop an "historically rooted expectation of compensation for such a seizure." 959 F.2d at 958. Indeed, the owner voluntarily had subjected itself "to an expansive statutory regulatory system," and

it is well known that " 'banking is one of the longest regulated and most closely supervised of public callings.' " *Id.* (quoting *Fahey v. Mallonee,* 332 U.S. 245, 250, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947)).

The Federal Circuit extended this holding in *Branch v. United States,* 69 F.3d 1571 (Fed.Cir.1995), ruling that the placement of a financial institution in receivership pursuant to FIRREA did not constitute a *per se* taking of plaintiff's property.[17] Nor did it constitute a regulatory taking when viewed in light the character of the government action, its impact on the claimant, and the reasonableness of the claimant's investment-backed expectations.[18] More recently, the Federal Circuit rejected the argument that the passage of FIRREA took the rights created by a contract between plaintiff and the Government whereby plaintiff acquired a financially troubled thrift in exchange for certain regulatory forbearances. *See Castle v. United States,* 301 F.3d 1328 (Fed.Cir.2002). Citing *Branch,* the court determined that plaintiff had retained its contractual remedies and that the contract had not created a reasonable expectation that the Government would cease to regulate the thrift industry. Accordingly, plaintiff's recovery for the seizure of its thrift property was in contract, not in takings law.

Plaintiff presents the same theory of relief rejected by the Federal Circuit in the cited decisions—that, by exercising its regulatory mandate, a federal agency that monitors the banking industry has effected a taking of property. Plaintiff's property was not placed in receivership. Rather, he argues that the

---

**15.** Even if this court possessed jurisdiction over plaintiff's claim based on promissory estoppel, he has not made the requisite showing to survive summary judgment. To establish a claim for promissory estoppel, a claimant must show: (1) A promise or representation was made; (2) the claimant's reliance on this promise was detrimental and reasonable; and (3) the promisor reasonably should have expected the detrimental reliance. *Law Mathematics & Tech., Inc. v. United States,* 779 F.2d 675, 678 (Fed.Cir.1985). Plaintiff has not presented evidence that a promise was made by and between the OCC and plaintiff or that the OCC reasonably should have expected plaintiff to rely on the alleged promise.

**16.** In *Loretto* the Supreme Court held that a state statute requiring a landlord to allow cable television facilities to be installed on her property was a compensable taking. The Court hinged its ruling on the fact that the statute effected "a permanent physical occupation authorized by [the] government." 458 U.S. at 426, 102 S.Ct. 3164.

**17.** *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

**18.** *See Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

OCC's investigation into his alleged violation of the loan-to-one borrower rule resulted in an unconstitutional taking because the investigation interfered with his planned lending program. Under the reasoning of *California Housing, Branch,* and *Castle,* plaintiff's takings claim cannot be sustained.

## CONCLUSION

Plaintiff has not presented sufficient evidence to put in issue whether a contract existed between plaintiff and the OCC whereby plaintiff would be free to implement his business plan without regulatory interference in exchange for certain capital concessions. His claim for promissory estoppel is one over which this court lacks jurisdiction. Plaintiff also has failed to substantiate a viable takings theory in light of Federal Circuit jurisprudence on the subject of takings vis-à-vis federal regulation of the banking industry. Accordingly, based on the foregoing,

1. Defendant's motion for summary judgment is granted as to plaintiff's claims for breach of contract, repudiation/anticipatory breach of contract, frustration of purpose, and a taking.

2. Defendant's motion is also granted insofar as the court lacks jurisdiction to consider plaintiff's claim for promissory estoppel.

3. The Clerk of the Court shall enter judgment for defendant with respect to Counts I, II, III, V, and VI of the complaint and a judgment of dismissal without prejudice for lack of jurisdiction with respect to Count IV of the complaint.

**IT IS SO ORDERED**.